UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Ann M. Sanchez,                          )
                                         )
        Plaintiff,                       )
                                         )
            v.                           )    Case No. 3:18-cv-30084-KAR
                                         )
Nancy A. Berryhill,                      )
Acting Commissioner of Social            )
Security Administration,                 )
                                         )
        Defendant.                       )


MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF
THE COMMISSIONER
(Docket Nos. 14 & 16)

ROBERTSON, U.S.M.J.

    I.    INTRODUCTION

        Ann M. Sanchez ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking review of a final decision of the Acting Commissioner of Social Security

("Commissioner") denying her application for Social Security Disability Insurance Benefits

("DIB").  Plaintiff applied for DIB on November 13, 2012, alleging an August 24, 2012 onset of

disability due to problems stemming from the following impairments:  low back pain with two

empty discs in the lower spine; degenerative disc disease with pain in both hips and numbness in

the legs; migraines; anxiety; depression; and insomnia (A.R. at 165, 334). [1]  On January 29,

2015, the Administrative Law Judge ("ALJ") found that Plaintiff was not disabled and denied her

---

[1] A copy of the Administrative Record (referred to herein as "A.R.") has been filed under seal
(Dkt. No. 11).

application for DIB (A.R. at 197-213). The Appeals Council vacated the decision and remanded the case to the ALJ to: further evaluate Plaintiff's mental impairments and their effect on her residual functional capacity ("RFC"); address the severity of her fibromyalgia pursuant to Social Security Ruling ("SSR") 12-2p, 2012 WL 3104869 (July 25, 2012); and consider the third party function reports of Plaintiff's daughter (A.R. at 220-22). After a re-hearing on March 15, 2017, the ALJ again found that Plaintiff was not disabled and denied Plaintiff's DIB claim (A.R. at 72-85 ). The Appeals Council denied review (A.R. at 1-7) and, thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

Plaintiff appeals the Commissioner's denial of her claim on the ground that the decision is not supported by "substantial evidence" under 42 U.S.C. § 405(g). Pending before this court are Plaintiff's motion for judgment on the pleadings requesting that the Commissioner's decision be reversed or remanded for further proceedings (Dkt. No. 14), and the Commissioner's motion for an order affirming the decision of the ALJ (Dkt. No. 16). The parties have consented to this court's jurisdiction (Dkt. No. 13). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons stated below, the court will grant the Commissioner's motion for an order affirming the decision and deny Plaintiff's motion.

II. FACTUAL BACKGROUND

Plaintiff alleges that the ALJ erred by: (1) failing to afford controlling weight to the opinion of Plaintiff's primary care physician ("PCP") regarding the severity of Plaintiff's physical impairments; and (2) failing to include a total restriction on Plaintiff's ability to operate foot or leg controls in the RFC notwithstanding his inclusion of that degree of restriction in the hypothetical that he posed to the Vocational Expert ("VE") at the hearing. Accordingly, the

background information will be limited to facts relevant to those issues and additional pertinent facts will be discussed in the analysis.

A.   Plaintiff's Educational Background and Work History

Plaintiff was forty-three years old at the time of the hearing on March 15, 2017, had an adult daughter, and was living alone (A.R. at 101, 106-07, 423).  Plaintiff received vocational training and obtained a GED (A.R. at 106).  She had worked as a personal care attendant, a medical unit secretary at a hospital, a phlebotomist, an office manager who supervised six or seven people, and a medical receptionist (A.R. at 83, 109-111).  She stopped working because of back pain (A.R. at 109).

B.   Plaintiff's Physical Condition

1.   Opinions

(a)  *Dr. Hayfron-Benjamin's Opinion*

On October 30, 2014, Christina Hayfron-Benjamin, M.D., Plaintiff's PCP at Riverbend Medical, completed a "Medical Opinion Re:  Ability to Do Work-Related Activities" form (A.R. at 648-49).  According to Dr. Hayfron-Benjamin, Plaintiff could:  lift and carry less than ten pounds; stand and walk for less than two hours, with normal breaks, during an eight-hour day; and sit for about two hours, with normal breaks, during an eight-hour day (A.R. at 648).  She could sit and stand for ten minutes before changing position (A.R. at 648).  Dr. Hayfron-Benjamin attributed these limitations to the disc disease of Plaintiff's lumbar spine, fibromyalgia, and regional pain syndrome (A.R. at 648).  Dr. Hayfron-Benjamin further opined that Plaintiff's disc disease rendered her completely unable to twist, stoop, crouch, or climb ladders (A.R. at 649).  She could occasionally climb stairs (A.R. at 649).  In addition, Plaintiff's "chronic pain [and] lower back pain with radiculopathy" affected her ability to reach, push/pull, and handle and

feel objects (A.R. at 649). According to Dr. Hayfron-Benjamin, x-rays and physical examinations supported those restrictions (A.R. at 649). Plaintiff's condition required the avoidance of all exposure to extreme cold and concentrated exposure to extreme heat (A.R. at 649). Dr. Hayfron-Benjamin further opined that: Plaintiff "is disabled with her chronic pain syndrome and [illegible] behavioral health issues" and would be absent from work more than four days per month (A.R. at 649).

*(b) State Agency Consultants' Opinions*

On May 13, 2013, Robert B. McGan, M.D. assessed Plaintiff's RFC based on a review of her records (A.R. at 171-72). Dr. Robbins opined that Plaintiff could: lift twenty pounds occasionally and ten pounds frequently; stand and/or walk for two hours and sit for six hours during an eight-hour work day with normal breaks; and occasionally climb ramps, stairs, ladders, ropes, or scaffolds, balance, stoop, kneel, crouch, and crawl (A.R. at 171-72). In addition, she should avoid: concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation; and hazards, such as machinery and heights (A.R. at 172). Dr. McGan opined that Plaintiff could perform sedentary jobs and was not disabled (A.R. at 176-77).

Marie Turner, M.D. conducted a reconsideration evaluation of Plaintiff's physical RFC on December 26, 2013 (A.R. at 187-89). Dr. Turner's opinion mirrored Dr. McGan's except Dr. Turner opined that Plaintiff could stand and/or walk and sit for about six hours during an eight-hour work day with normal breaks and did not have any environmental limitations (A.R. at 188-89). As support for her opinions, Dr. Turner noted that Plaintiff's "[m]ore recent exams [were] quite [normal]" (A.R. at 189). Dr. Turner determined that Plaintiff could perform light, unskilled jobs and was not disabled (A.R. at 192-93).

### 2. Third Party Function Report

Plaintiff's twenty-year-old daughter, Briana D. Tyndal, completed a Third Party Function Report form on September 12, 2013 (A.R. at 423).[2]  Ms. Tyndal indicated that Plaintiff's back and body pain, which had increased in the "past few months," limited her ability to lift a gallon of milk, squat, bend, stand, walk for more than five minutes without resting, sit, kneel, climb stairs, and remember (A.R. at 423, 428).  Plaintiff needed Ms. Tyndal's assistance to get out of bed, dress, care for her hair, and perform household chores (A.R. at 424).  Plaintiff spent her days lying on the bed or couch (A.R. at 423).  She was no longer able to grocery shop, exercise, socialize, clean, and cook, although she prepared microwave meals, frozen dinners, and snacks (A.R. at 424, 425, 427, 428).  She did laundry and dusted "sometimes," drove, shopped on the computer, and went to weekly therapy appointments (A.R. at 425-27).  She enjoyed reading and watching TV every day (A.R. at 427).

### C.  The ALJ Hearing

Plaintiff and independent VE Michael Dorval testified at the hearing before the ALJ on March 15, 2017 (A.R. at 101).  Plaintiff described her lower back pain and fibromyalgia.

### 1. Plaintiff's Testimony

Plaintiff testified regarding her most significant condition:  constant low back pain, which radiated into her hips and down her right leg (A.R. at 111, 112, 119, 121).  The pain suddenly started one day when she bent over (A.R. at 112).  Without any over-the-counter or prescription medication, she experienced pain of 10 on a scale of 10 (A.R. at 112-13).  With medication, she

---

[2] Plaintiff's daughter completed the same form on April 18, 2013 (A.R. at 396).  The information that she supplied on that form was consistent with the information that she supplied in September 2013 (A.R. at 396-403).

rated the pain as 7 on a scale of 10 (A.R. at 113). She had a history of receiving injections about

every six months, which "sometimes" relieved her back pain (A.R. at 111, 113, 119-20). Over-

the-counter heat patches, hot showers, a heating blanket, and elevating her legs also provided

relief (A.R. at 120-21). Although she had experience with physical therapy, it had not alleviated

her condition (A.R. at 111, 120). At the time of the hearing, she was not taking prescription

medication or receiving injections to relieve her back pain because she had just returned to

Massachusetts from South Carolina where she did not have health insurance (A.R. at 107, 111).

In addition, in approximately 2013, Plaintiff had been diagnosed as having fibromyalgia,

which caused "body ache, and pain behind [her] knees and [her] joints" and in the back of her

head (A.R. at 114, 115, 121). Plaintiff described the pain as "hard" (A.R. at 121). She

occasionally experienced flare-ups (A.R. at 122). The fibromyalgia affected the strength of her

right hand so that she had difficulty picking up and holding objects (A.R. at 122). Consequently,

she avoided lifting objects with her right hand (A.R. at 122-23). Medication and the application

of heat relieved the pain (A.R. at 115, 122).

Plaintiff described her physical limitations and daily activities. She was able to: sit

comfortably for ten or fifteen minutes before changing her position; stand for ten or fifteen

minutes; and walk for five minutes before taking a break (A.R. at 123). Her ability to twist,

bend, squat, and climb stairs was limited (A.R. at 120, 124). Plaintiff cooked "quick" meals and

did her laundry (A.R. at 116). She was able to bathe, groom, and dress herself (A.R. at 116).

With the exception of attending medical appointments, she did not leave her home (A.R. at 117).

On an average morning, she made coffee, read, tried to relax, and took medication to relieve her

pain (A.R. at 117). She also watched TV and listened to the radio during the day (A.R. at 117).

2.    The VE's Testimony

In order to elicit the VE's opinion of whether Plaintiff could perform her past jobs or jobs that existed in the regional and national economy, the ALJ asked the VE to assume a person with Plaintiff's age, education, and work experience who could engage in sedentary work (A.R. at 130).

> The work should be simple and routine in nature.  The work should not entail direct overhead lifting or reaching, or should not be performed at heights using ladders, ropes, or scaffolding, or should not entail more than occasional, and occasional being defined up to one-third of the work day using ramps, stairs, stooping, crouching, crawling, and kneeling.  Work should be outside of loud, noisy, or bright sunny environments.  The work should entail no more than occasional, and occasional being defined as up to one-third of the work day, co-worker or public contact.  Work should not require the operation of foot or leg controls.  Work should be outside of environments having more than incidental exposure to extremes of cold, heat, fumes, dust, gases, humidity, or vibration, and work should entail no more than frequent, and frequent being defined as up to two-thirds of the work day, grasping, pinching, or twisting with the right hand and arm.

(A.R. at 130).  The VE testified that the hypothetical individual could not perform Plaintiff's past jobs, but could work as a telephone order clerk, surveillance system monitor, and polisher of optical goods (A.R. at 130-31).  However, those jobs would not be available to a person who was off-task from work duties for at least one-third of the work day or who was absent from work for four or more days per month (A.R. at 131).

III.    THE COMMISSIONER'S DECISION

A.    <u>Legal Standard for Entitlement to Disability Insurance Benefits</u>

In order to qualify for DIB, a claimant must demonstrate that she is disabled within the meaning of the Social Security Act.[3]  A claimant is disabled for purposes of DIB if she "is unable to engage in any substantial gainful activity by reason of any medically determinable

---

[3] There is no challenge to Plaintiff's insured status for purposes of entitlement to DIB.  *See* 42 U.S.C. § 423(a)(1)(A).

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity when she

> is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 423(d)(2)(A). The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. § 404.1520(a)(4)(i-v). The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. 20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id.*

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or

> mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate her RFC. *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations. *See Goodermote*, 690 F.2d at 7.

B.      The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations. *See* 20 C.F.R. § 404.1520(a)(4)(i-v); *see also Goodermote*, 690 F.2d at 6-7. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 24, 2012 (A.R. at 74). *See* 20 C.F.R. § 404.1571 *et seq.* At step two, the ALJ found that Plaintiff had the following severe impairments: depression; degenerative disc disease; headaches; fibromyalgia; asthma; and right arm weakness (A.R. at 74). *See* 20 C.F.R. § 404.1520(c). For purposes of step three, the ALJ reviewed Plaintiff's impairments and determined that her impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. at 80-81). *See* 20 C.F.R. §§ 404.2520(d), 404.1525, 404.1526.

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at Step Four to determine whether she could perform past relevant work and, if the analysis continued to Step Five, to determine if she could do other work. *See* 20 C.F.R. § 404.1520(e). The ALJ

determined that the Plaintiff had the RFC to perform sedentary work[4] with the following additional limitations:

> she cannot perform direct overhead lifting/reaching. She can no more than occasionally operate foot/leg controls. She can perform no more than frequent grasping, pinching, and twisting with her right hand. She can no more than occasionally climb ramps, climb stairs, stoop, kneel, crouch, or crawl. She must avoid heights and she cannot climb ladders, ropes, or scaffolds. She must avoid more than incidental exposure to extremes of cold, heat, fumes, dust, gases, humidity, and vibration. She must avoid loud, noisy environments and bright, sunny environments. She is limited to simple, routine tasks. She can tolerate no more than occasional contact with coworkers and the general public.

(A.R. at 81). At step four, the ALJ found that Plaintiff was not able to perform her past relevant work (A.R. at 83). *See* 20 C.F.R. § 404.1565. However, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform the jobs of telephone clerk, surveillance system monitor, and polisher of optical goods, which existed in the national and regional economies (A.R. at 84). *See* 20 C.F.R. §§ 404.1569, 404.1569(a). Consequently, on June 1, 2017, the ALJ concluded that Plaintiff was not disabled since August 24, 2012 (A.R. at 84). *See* 20 C.F.R. § 404.1520(g).

IV.    STANDARD OF REVIEW

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'" *Coskery v. Berryhill,* 892

---

[4] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The court reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (unpublished) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not."  *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003)).  *See Augustin v. Berryhill,* Civil Action No. 18-10761-PBS, 2019 WL 1778153, at *6 (D. Mass. Apr. 23, 2019) ("The substantial evidence standard is 'not high' and requires only 'such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion.'") (alteration in original) (quoting *Biestek v. Berryhill,* 139 S. Ct. 1148, 1154 (2019)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F. App'x. at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

V.     ANALYSIS

**A.     Substantial evidence supported the ALJ assignment of "little weight" to Plaintiff's treating physician's opinion regarding Plaintiff's work-related limitations due to her back condition and fibromyalgia.**

Plaintiff first alleges that the ALJ erred by assigning "little weight" to the October 30, 2014 medical opinion of Dr. Hayfron-Benjamin (Dkt. No. 15 at 9-15; A.R. at 83). According to Plaintiff, Dr. Hayfron-Benjamin's assessment of the limitations caused by her back condition and fibromyalgia should have been afforded controlling weight because the PCP was a treating source (Dkt. No. 15 at 9). The Commissioner contends that the ALJ's determination was supported by substantial evidence (Dkt. No. 17 at 6-11). In consideration of the record, the court agrees with the Commissioner.

Under the Social Security regulations and rulings that were effective at the time of Plaintiff's application for DIB, a medical opinion is a statement from an "acceptable medical source[]" that reflects "judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).[5] A licensed physician is an "acceptable medical source." 20 C.F.R. § 404.1513(a)(1); SSR 06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006).[6] A treating source is an "acceptable medical source" who "provides [the claimant], or has provided [the claimant], with

---

[5] The rules articulated in 20 C.F.R. § 404.1527 apply to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.1527. Plaintiff filed her claim on or about November 13, 2012 (A.R. at 334).

[6] The Commissioner revised 20 C.F.R. § 404.1513 and rescinded SSR 06-03p effective for claims filed on or after March 27, 2017. *See Jessica B. v. Berryhill,* No. 1:17-cv-294-NT, 2018 WL 2552162, at *6 n.5 & *7 n.6 (D. Me. June 3, 2018). Because Plaintiff's claim was filed prior to that date, the prior version of 20 C.F.R. § 404.1513(a)(1) and SSR 06-03p, which defined "acceptable medical source," were in effect for her claim (A.R. at 334).

medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R.. § 404.1527(a)(2).

"In the First Circuit, an opinion is 'not entitled to greater weight merely because' it is provided by a 'treating source.'"  *Smith v. Berryhill,* 370 F. Supp. 3d 282, 287 (D. Mass. 2019) (quoting *Barrientos v. Sec'y of Health & Human Servs.,* 820 F.2d 1, 2-3 (1st Cir. 1987)).  A treating source's opinion on the nature and severity of a claimant's impairment(s) is entitled to controlling weight if it:  (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  *See Polanco-Quinones v. Astrue,* 477 F. App'x 745, 746 (1st Cir. 2012) (unpublished); SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996).[7] Conversely, when a treating physician's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record," the requirement of controlling weight does not apply.  *Id.* at *4. "This means that while there is a general presumption of deference to the treating physician's opinion, the ALJ can choose not to grant the opinion controlling weight if that opinion is inconsistent with other substantial evidence in the record."  *Abubakar v. Astrue*, Civil Action No. 1:11-cv-10456-DJC, 2012 WL 957623, at *8 (D. Mass. Mar. 21, 2012) (citing *Green v. Astrue,* 588 F.Supp.2d 147, 154 (D. Mass. 2008)).  *See Bourinot v. Colvin*, 95 F. Supp. 3d 161, 175 (D.

[7] The Commissioner rescinded SSR 96-2p, which addresses assigning controlling weight to treating source medical opinions, for claims filed after March 27, 2017.  *See Lopez Davila v. Berryhill*, Civil Action No. 17-12212-ADB, 2018 WL 6704772, at *10 (D. Mass. Nov. 6, 2018), *report and recommendation adopted sub nom. Davila v. Berryhill*, Civil Action No. 17-CV-12212-ADB, 2018 WL 6499862 (D. Mass. Dec. 11, 2018) (the Commissioner recently rescinded SSR 96-2p for all claims filed on or after March 27, 2017) (citing SSR 96-2p, 2017 WL 3928305 (Mar. 27, 2017)); *see also Purdy*, 887 F.3d at 13 n.8.  Because Plaintiff's claim was filed before that date, the court relies upon SSR 96-2p (A.R. at 334) .

Mass. 2015) ("The regulations allow the ALJ to discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians.") (citing *Arruda v. Barnhart,* 314 F. Supp. 2d 52, 72 (D. Mass. 2004)); *see also* 20 C.F.R. § 404.1527(c)(2)-(4).  "Decisions regarding inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ, and not the [c]ourt, to resolve." *Abubakar,* 2012 WL 957623, at *8 (citing *Costa v. Astrue,* 565 F. Supp. 2d 265, 271 (D. Mass. 2008)).

If the ALJ fails to give a treating source's opinion controlling weight, he considers the following factors in deciding the weight to be assigned to the medical opinion:

> "(1) whether the medical opinion is based on an actual examination; (2) if a treatment relationship exists, the length of the treatment, frequency of examination, and nature and extent of the relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) the specialty of the opinion-giver; and (6) other factors that support or contradict the opinion."

*Coe v. Colvin*, Civil Action No. 15-30037-MGM, 2016 WL 3350995, at *6 (D. Mass. June 15, 2016) (quoting *Small v. Astrue*, 840 F. Supp. 2d 458, 465 (D. Mass. 2012) (citing 20 C.F.R. § 404.1527(c)(1)-(6)).  Although an ALJ who does not give a treating source's opinion controlling weight is not required to address each factor enumerated in the regulations, he must provide "good reasons" for the weight he assigned to the opinion. *Small*, 840 F. Supp. 2d at 465. *See Augustin,* 2019 WL 1778153, at *7; 20 C.F.R. § 404.1527(c)(2).

1.      The ALJ's Assessment of Dr. Hayfron-Benjamin's Opinion

There is no dispute that Dr. Hayfron-Benjamin, Plaintiff's PCP who began treating her in November 2012, was a treating source (A.R. at 462).  *See Augustin,* 2019 WL 1778153, at *6 ("Dr. Moulton qualifies as a treating source because she is a [PCP] who saw Plaintiff at multiple appointments over the course of nine months.").  As noted earlier, Dr. Hayfron-Benjamin opined

that Plaintiff's ability to lift, sit, stand, and walk was severely limited by the disc disease of her lumbar spine, fibromyalgia, and "[r]egional pain syndrome" (A.R. at 648). She opined that Plaintiff's disc disease restricted her postural activities (A.R. at 649). Her opinion regarding Plaintiff's physical function limitations due to chronic pain and low back pain with radiculopathy were based on "x[-]rays [and] physical exam" (A.R. at 649). According to Dr. Hayfron-Benjamin, Plaintiff was disabled due to her "chronic pain syndrome and [illegible] behavioral health issue" (A.R. at 649).

The ALJ was not required to accept Dr. Hayfron-Benjamin's opinion that Plaintiff was disabled because that opinion is reserved to the Commissioner. *See Alberts v. Astrue*, Civil Action No. 11-11139-DJC, 2013 WL 1331110, at *9 (D. Mass. Mar. 29, 2013) ("The Social Security regulations reserve the decision of whether an individual is disabled for the Commissioner."); 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant] is disabled."). In addition, the ALJ assigned "little weight" to the remainder of Dr. Hayfron-Benjamin's opinion of October 30, 2014 "because it [was] inconsistent with her unremarkable physical examination findings on the same date . . . , and inconsistent with the multiple other unremarkable physical examination findings and the mild MRI findings found throughout the record" (A.R. at 83). Because Plaintiff maintains that the ALJ erred in his assessment of Dr. Hayfron-Benjamin's opinion as it concerned the condition of Plaintiff's back and fibromyalgia, the factors upon which the ALJ relied in discounting Dr. Hayfron-Benjamin's opinion will be discussed in relation to those conditions.

2.      Plaintiff's Back Condition

Given Plaintiff's reports that her back pain prevented her from working, the ALJ's decision focused on the condition of Plaintiff's back (A.R. at 111, 541).

<em>(a)      Records of Dr. Hayfron-Benjamin and Riverbend Medical</em>

The record supports the ALJ's conclusion that Dr. Hayfron-Benjamin's opinion was inconsistent with the records of Plaintiff's visits to her and other medical care providers at Riverbend Medical before and after October 30, 2014, the date on which Dr. Hayfron-Benjamin completed the assessment form. *See Bourinot*, 95 F. Supp. 3d at 177-78 (the ALJ discounted the treating source's opinion because it was inconsistent with the source's own treatment notes); *Lopes v. Barnhart*, 372 F. Supp. 2d 185, 194 (D. Mass. 2005) (same). On that date, Plaintiff complained of hip and back pain (A.R. at 665). Dr. Hayfron-Benjamin noted that Plaintiff was "in no acute distress" and her physical exam was unremarkable (A.R. at 667).

The records of Plaintiff's first visit to Dr. Hayfron-Benjamin on November 2, 2012 and subsequent visits on September 24, November 8, and November 26, 2013 indicated that, upon examination of Plaintiff's back, there was "no pain to palpation with good flexion and extension" (A.R. at 462, 464, 558, 625, 627, 628, 630). On January 7, 2014, Plaintiff reported to Dr. Hayfron-Benjamin that her MRI showed "[two] severely herniated disc[s] in her back" (A.R. at 622). On March 12, 2014, Dr. Hayfron Benjamin discussed Plaintiff's MRI results with Plaintiff, which were inconsistent with Plaintiff's earlier report (A.R. at 622). There was no "spinal stenosis or nerve impingement but [there was] some disc bulging" (A.R. at 622). Dr. Hayfron-Benjamin opined that Plaintiff "might be able to control [the] pain" with physical therapy and weight loss (A.R. at 622). On September 17, 2014, Dr. Hayfron-Benjamin referred Plaintiff to physiatry for "possible injections" and to "Mercy weight management" (A.R. at 619). On August 12, 2015, Plaintiff visited Stephanie Aviles, PA-C at Riverbend, asking for a referral for pain

16

management injections and a refill of the Voltaren prescription, which Plaintiff indicated had provided pain relief (A.R. at 658). The examination on that date revealed that Plaintiff's low back was tender to palpation and flexion and extension were poor (A.R. at 661). About two months later on October 6, 2015, Plaintiff reported that an injection had provided significant relief of her low back pain (A.R. at 654). Dr. Hayfron-Benjamin's examination of Plaintiff's back revealed "no pain to palpation with good flexion and extension" (A.R. at 654, 657).

### (b) *Records of other Treating Sources*

The ALJ's assessment -- that Dr. Hayfron-Benjamin's opinion regarding Plaintiff's back condition was inconsistent with the "unremarkable" physical examination findings of other treating sources – was also supported by substantial evidence (A.R. at 83). *See Haggard v. Apfel,* 175 F.3d 591, 595 (8th Cir. 1999) ("[A] treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion itself."); *Johnson v. Colvin*, 204 F. Supp. 3d 396, 409 (D. Mass. 2016) (same).

On March 14, 2012, Plaintiff was not experiencing back pain when she visited a neurologist, John J. O'Connell, M.D., complaining of headaches and numbness in her foot (A.R. at 498).

The administrative record included treatment notes from Plaintiff's visits to New England Orthopedic Surgeons ("NEOS") that spanned the period from August 2012 to October 2013. Although Plaintiff walked with an antalgic gait when she visited Jason Asselin, PA-C of NEOS in August 2012, her gait was "smooth and rhythmic without abnormalities" on September 11, 2012 and July 5, 2013 (A.R. at 489, 490, 540). PA-C Asselin observed that Plaintiff rose from a seated position without difficulty during visits in August, September, and October 2012 and July 2013 (A.R. at 489,490, 491, 492, 540). In September 2012 and July and October 2013, PA-C

Asselin noted that visual inspection of Plaintiff's lumbar spine revealed no erythema, ecchymosis, edema, atrophy, or asymmetry (A.R. at 490, 491, 540, 561). Plaintiff's muscle strength was 5/5 and her range of motion was full in all lower extremity joints on those dates (A.R. at 489, 490, 491, 540). She had 70% range of motion in her lumbar spine in September 2012 and July 2013 (A.R. at 490, 540). On October 10, 2013, PA-C Asselin noted that Plaintiff had "full range of motion of the lumbar spine in all planes" and was "[n]ontender to palpation" (A.R. at 561).

The record of Plaintiff's November 28, 2012 visit to R. Scott Cowan, M.D., of NEOS indicates that "operative care" was not indicated for her "mild and fairly diffuse" multilevel degenerative disc disease (A.R. at 492). Dr. Cowan recommended injections and "a fairly serious weight loss program" (A.R. at 492).

Plaintiff's lower spine displayed a full range of motion and she walked without difficulty in the Mercy Medical Center ("Mercy") emergency department on October 14, 2012, although straight leg raises caused pain in her right buttock (A.R. at 474, 476). She reported that the back pain was more severe in the morning, but improved during the day (A.R. at 474). Plaintiff displayed a normal gait, a full range of motion at her waist with mild discomfort, and negative straight leg raises during a visit to the Mercy emergency department during the following month (A.R. at 469, 471-72).

Plaintiff first visited Marc A. Linson, M.D. for "another [orthopedic surgeon's] opinion" in November 2013 (A.R. at 605, 628). On March 11, 2014, after reviewing Plaintiff's radiological reports and the EMG/nerve conduction studies of her legs, Dr. Linson told Plaintiff that she appeared "sound" from a "structural point of view" (A.R. at 603, 604). He was unable to

identify the cause of her complaints (A.R. at 603).  According to the physician, there was "certainly nothing worrisome or fixable" (A.R. at 603).

Plaintiff went to the Mercy emergency department on January 30, 2015 complaining of right lower back pain that radiated down her right leg (A.R. at 695)  Plaintiff reported that her "chronic back pain" was aggravated when her daughter kneed her in the back during an altercation between Plaintiff, her daughter, and her daughter's boyfriend (A.R. at 695).  The record shows that there was "no swelling, gross deformity, or ecchymosis . . . in the thoracic or lumbar spine" (A.R. at 696).  The paraspinous muscles of the lumbar spine were tender to palpation, but there was no midline tenderness (A.R. at 696).  Extension and flexion of the lower extremities displayed 5/5 strength bilaterally as did the upper extremities (A.R. at 696).  Straight leg raises were negative bilaterally (A.R. at 696).

The ALJ noted that Dr. Hayfron-Benjamin's opinion was inconsistent with her records of Plaintiff's report that the lumbar epidural injections that were administered by Thenu Manikantan, M.D., of SV Pain Management provided complete pain relief (A.R. at 83, 654, 676, 682).[8]  On November 6, 2012, Dr. Manikantan examined Plaintiff who complained of low back pain that radiated into her hips and legs (A.R. at 685).  Her ambulation and tandem gait test were normal on that date (A.R. at 686).  Dr. Manikantan's examination of Plaintiff's lumbar spine

[8] Plaintiff's reports to treatment providers that the injections provided 100 percent pain relief contradicted her testimony that they relieved her pain "sometimes" (A.R. at 119-20, 654, 676, 682).  The ALJ cited this inconsistency as a basis for discounting her testimony regarding the severity of her pain (A.R. at 82).  *See Brown v. Colvin*, 111 F. Supp. 3d 89, 101 (D. Mass. 2015) ("Social Security regulations allow an ALJ to rely on such an inconsistency to discredit the claimant's subjective complaints."); SSR 16-3p, 2017 WL 5180304, at *8 (Oct. 25, 2017) (directing an ALJ to consider the consistency of a claimant's own statements by comparing statements made in connection with the claim for DIB with statements the claimant made in other circumstances).

revealed a negative straight-leg raising test, limited range of motion, pain that was worse on flexion, and tenderness on palpation of the lower lumbar region in the paraspinal region (A.R. at 686). Plaintiff's hips exhibited normal internal and external rotation (A.R. at 686). There was no trigger point pain, pain over the greater trochanteric bursa, or tenderness of the SI joints (A.R. at 686). Patrick's test was negative (A.R. at 686). Dr. Manikantan recommended a trial of lumbar epidural injections (A.R. at 687). A lumbar epidural steroid injection in December 2012 provided Plaintiff 100 percent relief from pain (A.R. at 682).

Dr. Manikantan noted that Plaintiff's gait was normal during her September 29, 2015 visit (A.R. at 679, 680). Plaintiff received a lumbar epidural steroid injection from Dr. Manikantan on that date (A.R. at 679, 681). Again, she reported "100% pain benefit" from the injection (A.R. at 676).

Plaintiff returned to Dr. Manikantan on May 13, 2016 (A.R. at 676). Dr. Manikantan noted "limited" range of motion of Plaintiff's lumbar spine (A.R. at 677). The pain was worse on flexion (A.R. at 677). The lower lumbar region was tender to palpation in the para spinal region and straight leg raises were positive on the right side (A.R. at 677). Dr. Manikantan recommended an MRI of Plaintiff's lumbar spine to "elucidate" the cause of her pain (A.R. at 678). On June 27, 2016, Dr. Manikantan reviewed the results of the June 2016 MRI, which revealed no change from the prior MRI except "disc desiccation and minimal disc space narrowing at L2-L3" (A.R. at 673, 675, 701-02). The record of Plaintiff's visit to Dr. Manikantan stated that Plaintiff was moving to South Carolina "this Friday" (A.R. at 673, 674). Dr. Manikantan advised her to find a pain physician there (A.R. at 675).

*(c)*     *Radiological and Electrical Studies*

Dr. Hayfron-Benjamin's assessment of the limitations on Plaintiff's ability to perform work-related activities also was not supported by the MRIs and electrical studies in the case record. *See Husted v. Astrue,* Civil Action No. 08-30119-KPN, 2009 WL 1259132, at *4 (D. Mass. May 6, 2009) (the ALJ's rejection of a treating source's assessment was warranted, in part, by the fact that "the x-rays and MRI revealed only nominal impairments").

The results of the electrical study that was conducted on March 14, 2012 were "normal" (A.R. at 516). There was "no evidence for radiculopathy or neuropathy by electrical testing in the right leg" (A.R. at 516).

The record supported the ALJ's determination that the MRI findings were "mild" (A.R. at 83). An MRI, which was performed on September 4, 2012, showed that "[m]ild spondylotic and degenerative disc changes of the lumbar spine [were] present. [A] [m]ild left foraminal narrowing [was] noted at L3-L4. No exiting or traversing nerve root impingement [was] noted within the lumbar spine" (A.R. at 493-94).

An MRI of Plaintiff's thoracic spine was conducted on December 6, 2012 to rule out multiple sclerosis (A.R. at 504). The MRI revealed a normal thoracic cord with no abnormal enhancement (A.R. at 504). There was no disc herniation, stenosis, or neural foramen narrowing of Plaintiff's thoracic spine (A.R. at 504).

The results of the December 7, 2013 MRI of Plaintiff's lumbar spine showed "no change" from the September 4, 2012 MRI (A.R. at 564); that is, there was a "[s]mall left foraminal protrusion at L3/4 without nerve root compression," "[slight] [d]isc desiccation at L5/S1," and no identified stenosis or focal nerve root compression (A.R. at 564, 565, 603).

The MRI of Plaintiff's cervical spine, which was conducted on January 25, 2014 at Dr. Linson's request, showed mild spondylotic and degenerative disc changes at C6-C7 without

significant central canal or foraminal narrowing (A.R. at 606-07). There was no indication of cord compression or exiting nerve root impingement (A.R. at 607).

Plaintiff underwent nerve conduction studies of both legs on February 7, 2014 (A.R. at 608). The results showed "a normal study" (A.R. at 609). There was "no electrophysiological evidence for a sciatic mononeuropathy, lumbosacral plexopathy or L2-S1 radiculopathy in the right leg. Additionally, there [was] no electrophysiological evidence for a generalized large-fiber polyneuropathy in the legs" (A.R. at 609).

The MRI of June 11, 2016, which Dr. Manikantan ordered, revealed "disc desiccation and minimal disc space narrowing at L2-L3, which [was] new compared to the exam from [December 7, 2013]. Other mild degenerative changes [were] stable as described, without canal stenosis or nerve root impingement" (A.R. at 701, 702).

In summary, the ALJ provided good reasons for discounting Dr. Hayfron-Benjamin's opinion that Plaintiff was disabled by her lumbar condition. "An ALJ is 'entitled to resolve conflicts in the record, and may reject the opinion of the treating physician so long as an explanation is provided and the contrary finding is supported by substantial evidence.'" *Oliveras v. Comm'r of Soc. Sec.*, 354 F. Supp. 3d 84, 92 (D. Mass. 2019) (quoting *Tetreault v. Astrue*, 865 F. Supp. 2d 116, 125 (D. Mass. 2012) (citations omitted)). The ALJ cited substantial evidence supporting his determination that Dr. Hayfron-Benjamin's opinion was inconsistent with her physical examinations of Plaintiff, the assessments of orthopedic specialists, and the radiological studies (A.R. at 74-79, 83). *See Bourinot,* 95 F. Supp. 3d at 175; 20 C.F.R. § 404.1527(c). Consequently, the ALJ's assignment of "little weight" to Dr. Hayfron-Brown's opinion regarding physical limitations caused by Plaintiff's back condition does not warrant reversal or remand of the ALJ's decision.

### 3. Fibromyalgia

Although Dr. Hayfron-Benjamin's opinion concerning Plaintiff's functional limitations mostly focused on those that were associated with her back condition, Dr. Hayfron-Benjamin opined that the limitations on Plaintiff's ability to carry more than ten pounds, stand and walk for up to two hours, and sit for more than two hours, were based on fibromyalgia as well as disc disease and regional pain syndrome (A.R. at 648). Relying on *Johnson v. Astrue,* 597 F.3d 409 (1st Cir. 2009) (per curiam), Plaintiff contends that the ALJ erred by grounding his assessment of Dr. Hayfron-Benjamin's opinion on the lack of objective evidence supporting it (Dkt. No. 15 at 20). The Commissioner persuasively counters that, in weighing Dr. Hayfron-Benjamin's opinion, the ALJ followed the rules and regulations governing the assessment of Plaintiff's statements regarding the severity of her fibromyalgia pain, which informed the physician's opinion concerning Plaintiff's physical limitations due to that condition (Dkt. No. 17 at 11-17).

"The SSA acknowledges that fibromyalgia may be a disabling condition, but requires sufficient objective evidence to support a finding that this impairment so limits a claimant's functional abilities that it precludes him or her from working." *DeCepeda v. Berryhill*, Case No. 17-cv-30080-KAR, 2018 WL 3748170, at *13 (D. Mass. Aug. 6, 2018) (citing *Medina-Augusto v. Comm'r of Soc. Sec.*, Civil No. 14-1431 (BJM), 2016 WL 782013, at *7 (D.P.R. Feb. 29, 2016)). "Fibromyalgia is defined as '[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause.'" *Johnson*, 597 F.3d at 410 (alteration in original) (quoting *Stedman's Medical Dictionary*, at 671 (27th ed. 2000)). "Although there are certain diagnostic criteria, the musculoskeletal and neurological examinations in fibromyalgia patients are normal, and there are no laboratory abnormalities." *Barowsky v. Colvin,* Case No. 15-cv-30019-KAR, 2016 WL 634067, at *4 (D. Mass. Feb. 17, 2016) (citing *Johnson,* 597 F.3d at 410). "It is therefore a

medically sound and appropriate diagnostic tool for a physician to rely on a patient's subjective reporting of her pain." *Ortiz v. Colvin,* Civil Action No. 14-30149-MGM, 2015 WL 6182470, at *7 (D. Mass. Oct. 20, 2015). That said, "[t]he extent to which a treating source's opinion evidence rests on a claimant's subjective, untested accounts of her symptoms and limitations is a factor on which an ALJ is entitled to rely in deciding what weight to accord to that evidence, and it is apparent that the ALJ took this factor into account in this case." *DeCepeda*, 2018 WL 3748170, at *12 (citations omitted).

"Social Security Ruling 12-2p, 2012 WL 3104869 . . . sets out guidance on how the SSA develops evidence to establish that a claimant has a medically determinable impairment of fibromyalgia and how fibromyalgia is evaluated in disability claims." *DeCepeda*, 2018 WL 3748170, at *13 (citing SSR 12-2p, 2012 WL 3104869, at *1). If an ALJ determines that the claimant's fibromyalgia is a medically determinable impairment, SSR 12-2p directs the ALJ to follow the evaluation process that is articulated in SSR 16-3p.[9] *See* SSR 12-2p, 2012 WL 3104869, at *5 (July 25, 2012). According to SSR 16-3p, "[i]n determining whether an individual is disabled, [the ALJ] consider[s] all of the individual's symptoms, including pain, and

---

[9] SSR 12-2p directed ALJs to follow the two-step process set forth in SSR 96-7p, 1996 WL 374186 (July 2, 1996). *See* SSR 12-2p, 2012 WL 3104869, at *5. However, "ALJs were directed to use SSR 16-3p instead of SSR 96-7p when making determinations and decisions regarding a claimant's symptoms on or after March 28, 2016." *Boardway v. Berryhill,* Case No. 3:17-cv-30069-KAR, 2018 WL 4323823, at *13 n.10 (D. Mass. Sept. 10, 2018) (citing SSR 16-3p, 2017 WL 5180304, at *1, 13 & n.27). The ALJ made the decision under review on June 1, 2017 (A.R. at 85). "The only significant difference between SSR 96-7p and SSR 16-3p is the elimination of the term 'credibility' from the new ruling." *Id. See Coskery*, 892 F.3d at 4 ("Following concerns raised by the Administrative Conference of the United States about symptom evaluation under . . . SSR [96-7p] . . . the SSA decided to 'eliminat[e] the use of the term "credibility" from [the] sub-regulatory policy' to make clear that a 'subjective symptom evaluation is not an examination of an individual's character.'") (third alteration in original) (quoting SSR 16-3p, 2017 WL 5180304, at *2 & n.1).

the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304, at *2.[10] The analysis involves a two-step process. *Id.* The ALJ first considers "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." *Id.* at *3. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . . " *Id.*

> When undertaking the second step, an ALJ must first determine whether the claimant's alleged symptoms are consistent with the objective medical evidence. If not, then the ALJ must consider the other evidence in the record, including "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the SSA's] regulations." SSR 16-3p, 2016 WL 1119029, at *5. The factors to which SSR 16-3p refers are set forth in 20 C.F.R. § 404.1529(c)(3), and are sometimes called the *Avery* factors . . . .

*Martin v. Berryhill*, Civil No. 18-cv-461-JL, 2019 WL 1987049, at *5 (D.N.H. May 6, 2019)

(citing *Avery v. Sec'y of Health & Human Servs.,* 797 F.2d 19, 29 (1st Cir. 1986)). The *Avery* factors include:

> 1. Daily activities;
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

---

[10] A "symptom" is defined as "the individual's own description or statement of his or her physical or mental impairment(s)." SSR 16-3p, 2017 WL 5180304, at *2.

> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2016 WL 1119029, at *7. *See Avery,* 797 F.2d at 29. Although an ALJ is not required to address every *Avery* factor in his written decision, *see Johnson,* 204 F. Supp. 3d at 413, he must consider "the entire case record" in making his finding regarding the intensity and persistence of the claimant's symptoms and the extent to which they limit the claimant's ability to perform work-related activities. SSR 16-3p, 2017 WL 5180304, at *5-10; SSR 12-2p, 2012 WL 3104869, at *5. *See Barowsky*, 2016 WL 634067, at *5 ("The ALJ was entitled, indeed required, to consider all of the evidence of record when weighing the credibility of Plaintiff's subjective claims of pain.").

Here, the ALJ followed the established procedure. Notwithstanding the absence from Dr. Hayfron-Benjamin's treatment records of the "specific criteria" necessary to diagnose fibromyalgia, *see* SSR 12-2p, 2012 WL 3104869, at *2-3, the ALJ listed it as a severe impairment at step two of the sequential evaluation process (A.R. at 74). At the first step of the symptom analysis required by SSR 12-2p and SSR 16-3p, the ALJ recognized fibromyalgia as a medically determinable impairment that could reasonably be expected to produce Plaintiff's pain (A.R. at 77, 79, 82). "[O]nce the ALJ accepted the diagnosis of fibromyalgia, []he also '*had no choice* but to conclude that the claimant suffer[ed] from the symptoms usually associated with [such condition], unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms.'" *Johnson,* 597 F.3d at 414 (third and fourth alterations in original) (citing *Rose v. Shalala,* 34 F.3d 13, 18 (1st Cir. 1994)). *See*

"Nonetheless, it does not follow from a diagnosis of fibromyalgia that a claimant is necessarily disabled." *Barowsky,* 2016 WL 634067, at *4.

Although the ALJ identified fibromyalgia as a medically determinable impairment that caused Plaintiff pain at the first step of the SSR 12-2p and SSR 16-3p analysis, he followed the procedure proscribed by the rulings as a basis for concluding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" (A.R. at 82). *See Hebert v. Colvin,* No. 13-cv-102-SM, 2014 WL 3867776, at *8 (D.N.H. Aug. 6, 2014) ("Here, while claimant plainly suffers from fibromyalgia, the ALJ concluded, based upon substantial evidence in the record, that it did not render her disabled. And, he supportably found that claimant's assertions to the contrary were not entirely credible.") (citing *Cusson v. Liberty Life Assur. Co.,* 592 F.3d 215, 227 (1st Cir. 2010); *Downs v. Comm'r, Soc. Sec. Admin.,* No. 2:13-CV-02-DBH, 2014 WL 220697, at *4 (D. Me. Jan. 21, 2014) ("*Johnson* does not stand for the proposition that an [ALJ] who finds a severe impairment of fibromyalgia must accept claimant's allegations regarding the extent of . . . her limitations at face value.")). In the absence of objective medical evidence to support Plaintiff's description of the intensity and persistence of her symptoms, the ALJ considered Plaintiff's statements describing her pain and evaluated her statements in light of the *Avery* factors. *Compare Coe,* 2016 WL 3350995, at *7 (the ALJ in *Johnson* "erred by 'requiring objective evidence beyond the clinical findings necessary for a *diagnosis* of fibromyalgia under established medical guidelines.'") (quoting *Johnson,* 597 F.3d at 412). Based on those factors, the ALJ determined that Plaintiff's symptoms did not limit her ability to perform work-related activities to the extent Dr. Hayfron-Benjamin described (A.R. at 82-83). "[I]n a social security disability case, '[a] fact-finder's assessment of a party's credibility . . . is

given considerable deference and, accordingly, a reviewing court will rarely disturb it." *Smith,* 370 F. Supp. 3d at 291 (second alteration in original) (quoting *Anderson v. Astrue,* 682 F. Supp. 2d 89, 96 (D. Mass. 2010)). *See Coe,* 2016 WL 3350995, at *8 ("Even more so than in other contexts, 'the "credibility determination is a vital piece of the puzzle and therefore critical to the outcome"' of fibromyalgia cases.") (quoting *Howcroft v. Colvin*, C.A. No. 15-201S, 2016 WL 3063858, at *10 (D.R.I. Apr. 29, 2016)).

The ALJ's conclusion regarding Plaintiff's description of the intensity and persistence of her symptoms was supported by the record evidence. *See Bourinot*, 95 F. Supp. 3d at 182 (affirming denial of benefits where record supported ALJ's finding that fibromyalgia was not disabling). Plaintiff testified that she was able to cook, do her laundry, and bathe, groom, and dress herself (A.R. at 82, 116). *See Avery,* 797 F.2d at 29 (claimant's daily activities are a factor to be considered in the pain analysis). She reported that the fibromyalgia did not "flare up" often and medication provided pain relief (A.R. at 122). In addition, Dr. O'Connell, who treated Plaintiff's migraine headaches and other neurological symptoms, consistently reported that her headaches were controlled by medication (A.R. at 496, 498, 500, 502). *See Avery,* 797 F.2d at 29 (the duration, frequency, and intensity of pain and the effectiveness of medication are factors to be considered in evaluating a claimant's statements about her pain); 20 C.F.R. § 404.1529(c)(3) (same). Plaintiff testified that she had used only over-the-counter medication during the previous eight months while she lived in South Carolina (A.R. at 82, 101, 105, 107, 111, 112, 113, 115-16). *See Boulia v. Colvin*, Case No. 15-cv-30103-KAR, 2016 WL 3882870, at *7 (D. Mass. July 13, 2016) ("[T]he ALJ properly considered the type of medication Plaintiff was taking and treated his reliance on over-the-counter pain medication as a factor bearing on the credibility of his claim of disabling pain."); *Suarez-Linares v. Comm'r of Soc. Sec.*, 962 F. Supp.

2d 372, 379 (D.P.R. 2013) (ALJ properly relied on the "generally conservative nature" of plaintiff's pain medication regimen as a factor undermining plaintiff's claim of disabling pain).

Further, there was evidence of Plaintiff's failure to comply with treatment recommendations.

> SSR [16-3p] does not preclude an ALJ, in assessing the claimant's symptoms, from considering whether a claimant has complied with treatment for the pain that the claimant purports to be suffering. In accord with the common-sense notion that a person who does not follow a course of treatment for pain may not be suffering from that pain as intensely as the person claims, SSR 16–3p expressly provides that an ALJ must "consider an individual's attempts . . . to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult or the ability to function independently."

*Coskery*, 892 F.3d at 6 (quoting SSR 16-3p, 2017 WL 5180304, at *9). *See Stimson v. Astrue*, Civil Action No. 10-30193-KPN, 2011 WL 6132025, at *5 (D. Mass. Dec. 1, 2011) (ALJ considered plaintiff's noncompliance with treatment in assessing his subjective statements). On November 20, 2012, Dr. O'Connell noted that Plaintiff "has not showed up for several appointments" (A.R. at 496). On April 6, 2016, Dr. Hayfron-Benjamin noted that Plaintiff had not gotten the blood testing that had been ordered on her previous visit (A.R. at 653). Moreover, Plaintiff consistently failed to comply with treatment providers' recommendations that she participate in a weight loss program in order to relieve her symptoms, including those associated with fibromyalgia (A.R. at 540, 617, 619, 622, 631, 651, 653). "[W]hile [Plaintiff] plainly suffer[ed] from fibromyalgia, the ALJ concluded, based on substantial evidence in the record, that it did not render her disabled. And, he supportably found that claimant's assertions to the contrary were not entirely credible." *Hebert*, 2014 WL 3867776, at *8.

This case is distinguishable from *Johnson* for two reasons. First, the ALJ modified the RFC for sedentary work to reflect Plaintiff's reported fibromyalgia symptoms (A.R. at 81, 83). *See Coe,* 2016 WL 3350995, at *7 ("Here, the ALJ accepted the diagnosis of fibromyalgia

and explicitly considered it in determining Plaintiff's RFC, so the issue in this case is not entirely identical to that in *Johnson*."); *Howcroft v. Colvin*, 2016 WL 3063858, at *11 (no *Johnson* error where the administrative law judge "accepted both the diagnosis of fibromyalgia and that fibromyalgia [had] caused [the plaintiff] to experience pain").  In addition, unlike the opinion of the treating physician in *Johnson*, none of Dr. Hayfron-Benjamin's opinions concerning Plaintiff's functional abilities was based solely on fibromyalgia (A.R. at 648-49).  *See Johnson*, 597 F.3d at 410-11.  Instead, Dr. Hayfron-Benjamin's opinions of Plaintiff's physical limitations were based on her lumbar disc disease as well as fibromyalgia (A.R. at 648-49).  The ALJ, therefore, was permitted to consider the objective medical evidence concerning Plaintiff's disc disease when assessing Dr. Hayfron-Benjamin's opinion.  *See Boardway,* 2018 WL 4323823, at *14 (the ALJ properly considered the objective medical evidence in assessing the treating physician's opinion because it was based on plaintiff's lumbar degenerative disc disease as well as fibromyalgia); *Grivois v. Colvin*, No. 1:14-cv-68-JHR, 2015 WL 1757152, at *3 (D. Me. Apr. 17, 2015) ("[T]he plaintiff does not make a persuasive case that the [ALJ] erroneously discounted his fibromyalgia solely on the basis of a lack of objective medical findings. . . . [T]he [ALJ] properly considered a lack of objective findings in that the plaintiff suffered not only from fibromyalgia but also from degenerative disc disease, and even the plaintiff was not sure which of those conditions was causing his pain.").

Dr. Hayfron-Benjamin's opinion of the extent to which Plaintiff's fibromyalgia restricted her ability to perform work-related activities was based on Plaintiff's statements concerning the intensity of her pain.  In addition to the inconsistency between the physician's opinion and the assessed severity of Plaintiff's pain as measured by the *Avery* factors, Dr. Hayfron-Benjamin's opinion was not supported by her recommendation that Plaintiff participate in physical therapy

and the December 2013 assessment of the state agency consultant, who considered fibromyalgia when assessing Plaintiff's functional limitations, and opined that Plaintiff's functional limitations were less severe than Dr. Hayfron-Benjamin indicated (A.R. at 187-88, 622).[11] *See Abubakar,* 2012 WL 957623, at *8 (controlling weight may not be given to a treating source's opinion that is inconsistent with other substantial record evidence); 20 C.F.R.. § 404.1527(c)(4); SSR 96-2p, 1996 WL 374188, at *1. It is the ALJ's responsibility, and not this court's, to resolve conflicts in the evidence and draw reasonable inferences from the record. *See Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991); *Rodriguez,* 647 F.2d at 222. The ALJ's decision to discount Dr. Hayfron-Benjamin's opinion is adequately explained and is supported by substantial evidence. Consequently, there is a basis to affirm the ALJ's decision.

B.     **The inconsistency between the condition posed in the hypothetical to the VE and the limitation in the RFC is harmless.**

Plaintiff complains that the hypothetical posed to the VE at the hearing contained a restriction that the ALJ omitted from the RFC (Dkt. No. 15 at 15-20). Specifically, the hypothetical included "work [that] should not require operation of foot or leg controls," but the RFC limited Plaintiff to "occasionally" operating foot or leg controls (A.R. at 81, 130). Because the limitation in the hypothetical was more restrictive than the limitation in the RFC, however, the inconsistency was harmless. "'[I]f the [expert] believed that jobs existed . . . which could be performed by a person with the set of limitations identified in the hypothetical, then a person with a set of limitations less restrictive than that identified in the hypothetical - i.e., the set of limitations identified in the [RFC] - could perform those same jobs.'" *Doyle v. Colvin*, Civil

---

[11] The ALJ assigned the state agency consultant's assessment "partial weight" because "evidence received at the hearing level show[ed] [Plaintiff] [was] more limited" (A.R. at 83).

Action No. 14-30098-MGM, 2015 WL 3649795, at *5 (D. Mass. June 10, 2015) (alterations in original) (quoting *Poland v. Apfel,* No CIV. C-99-128-B, 2000 WL 36950 at *14 n.19 (D.N.H. Dec. 22, 1999)).  *See Garcia v. Colvin*, C.A. No. 13-cv-30044-MAP, 2014 WL 458192, at *4 (D. Mass. Feb. 3, 2014) ("If an individual who is *completely* precluded from exposure to a specified condition is found capable of performing certain jobs, it necessarily follows that the same person is capable of working in jobs with only *occasional* exposure."); *Warren v. Astrue,* C.A. No. 10–cv–30053–MAP, 2011 WL 31292, at *5 (D. Mass. Jan.4, 2011) ("the hypothetical posed to the vocational expert was more restrictive and, thus, more favorable to Plaintiff.").  *Contrast Slovak v. Barnhart*, No. Civ. 02-231-M, 2003 WL 21246049, at *7 (D.N.H. May 29, 2003) (the hypotheticals were less restrictive than the ALJ's RFC assessment).

VI.    C̲O̲N̲C̲L̲U̲S̲I̲O̲N̲

For the above-stated reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 14) is DENIED and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Dkt. No. 16) is GRANTED.  The case will be closed.

It is so ordered.

Dated:  June 10, 2019                                    /s/ Katherine A. Robertson
                                                        KATHERINE A. ROBERTSON
                                                        U.S. MAGISTRATE JUDGE